**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHRISTOPHER MARTINEZ,**
                                        **Petitioner,**
        **vs.**                                                **9:09-cv-900**
                                                                **(MAD)**
**ROBERT KIRKPATRICK,** *Superintendent,*
*Wende Correctional Facility*,
                                        **Respondent.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

**OFFICE OF FREDERICK RENCH, PLLC**        **FREDERICK RENCH, ESQ.**
646 Plank Road
Suite 204
Clifton Park, New York 12065
Attorneys for Petitioner

**OFFICE OF THE NEW YORK STATE**            **LEILANI J. RODRIGUEZ, ESQ.**
**ATTORNEY GENERAL**
One Civic Center Plaza
Poughkeepsie, New York 12601
Attorneys for Respondent

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

        Petitioner is an inmate in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS") at Shawangunk Correctional Facility.  Petitioner was

convicted, following a jury trial in Oneida County Court, of second degree intentional murder

(N.Y. Penal Law § 125.25(1)), first degree assault (N.Y. Penal Law § 120.10(1)), and second

degree criminal possession of a weapon (N.Y. Penal Law § 265.03(2)).  *See* Dkt. No. 1 at 1; Dkt.

No. 13-15 at 726-28.

        On August 6, 2009, Petitioner filed a *pro se* petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.  *See* Dkt. No. 1.  The petition claimed, among other things, that Petitioner was denied effective assistance of counsel due to his trial counsel's drug addiction and the conflict of interest resulting from his trial counsel's investigation and prosecution.  On May 10, 2011, the Court dismissed the petition.  *See* Dkt. No. 35.  Specifically, the Court rejected Petitioner's ineffective assistance of counsel claim and found that no *per se*, actual, or potential conflict of interest existed between Petitioner and his attorney (Robert R. Moran).  *See id.* at 33-36.

On August 18, 2011, the Second Circuit granted a certificate of appealability "solely on the issue of whether Martinez was denied effective assistance of counsel due to a conflict of interest presented by the investigation and prosecution of Moran by the same district attorney's office that prosecuted Martinez."  *See* Dkt. No. 40 at 3.  In a summary order and mandate issued on July 19, 2012, the Second Circuit found that this Court erred in finding that Petitioner's conflict of interest claim was adjudicated on the merits in state court and, therefore, no evidentiary hearing was required for the Court to dispose of that claim.  *See id.* at 5.  As such, the Second Circuit remanded the case "solely for the purpose of an evidentiary hearing to determine whether an actual or potential conflict of interest existed and, if so, whether the conflict adversely affected Moran's representation."  *See id.*

On January 3, 2013, the Court held an evidentiary hearing and permitted the parties to file both pre- and post-hearing memoranda.  The petition is now ripe for disposition on the issues for which it was remanded by the Circuit.


## II. BACKGROUND

### A.      Indictment and pretrial proceedings

On February 5, 2003, Petitioner was indicted for second degree intentional murder (N.Y.

PENAL LAW § 125.25(1)), second degree depraved indifference murder (N.Y. PENAL LAW § 125.25(2)), first degree intentional assault (N.Y. PENAL LAW § 120.10(1)), first degree depraved indifference assault (N.Y. PENAL LAW § 120.10(2)), and second degree criminal possession of a weapon (N.Y. PENAL LAW § 265.03(2)). *See* Dkt. No. 12 at 5; Dkt. No. 13-1 at 5.

On April 10, 2003, a *Wade/Huntley*[1] hearing was held to determine the admissibility of photographic array identification procedures and Petitioner's statements to police. *See* Dkt. No. 13-15 at 14-64.[2] At the hearing, the prosecutor conceded that Petitioner's statements were not admissible in his case in chief because Petitioner requested an attorney and was not provided with one prior to making the statements. *See id.* at 59-60. The trial court ruled that Petitioner's statements were only admissible for impeachment purposes if Petitioner testified. *See id.* at 60. It also ultimately ruled that because the photographic identification procedures were not unduly suggestive or prejudicial, witnesses would be permitted to make in-court identifications of Petitioner. *See* Dkt. No. 13-1 at 57.

**B.     The trial**[3]

A jury trial was held from June 9, 2003 to June 13, 2003 before Judge Barry Donalty. The prosecutor was Paul Hernon of the Oneida County District Attorney's Office, and Petitioner was represented by Robert Moran. According to the testimony adduced at trial, on November 27, 2002, Petitioner and his friend visited Jennifer Halwig, Petitioner's fiancee, before going out for

---

[1] *United States v. Wade,* 388 U.S. 218 (1967); *People v. Huntley,* 15 N.Y.2d 72 (1965).

[2] Unless otherwise noted, the facts contained in the "Background" section of this Memorandum-Decision and Order are undisputed.

[3] The facts presented in this section are taken from the testimony presented at Petitioner's trial.

the evening.  *See* Dkt. No. 13-15 at 418-20.  Petitioner was wearing a red baseball cap.  *See id*. at 420.

On November 28, 2002, at approximately 12:30 a.m., Lee Ann Schavone was at Anthony's Bar in Utica, New York.  *See id.* at 313-16.  The victim, Gregory Moore, approached her and was bothering her.  *See id*. at 315-16.  Petitioner, who was wearing a red hat or bandanna, intervened and told Moore to leave Schavone alone.  *See id*. at 316-17, 330.  Moore grabbed Petitioner's gold chain and asked Petitioner what he was "going to do."  *See id*. at 317.  Petitioner did not respond, and eventually Petitioner and Moore separated.  *See id*. at 318-19, 330-31. Schavone did not see Moore or Petitioner with a gun.  *See id*. at 317-18, 331.

Schavone eventually left the bar, got into her truck, and pulled up to the front of the bar to wait for friends.  *See* Dkt. No. 13-15 at 319-20.  Once there, Schavone got out of her truck and talked to some friends on the side of the building.  *See id*. at 321.  As she returned to her truck, she saw Petitioner, who appeared nervous.  *See id*. at 322.  When she asked Petitioner if he was going to fight with Moore, Petitioner responded that he was not, and told Schavone to leave.  *See id*. at 322-23, 333.  As Schavone walked toward her truck, she heard gunshots, and then saw Moore lying on the ground.  *See id*. at 323.  At this point, Schavone got into her truck and left. *See id*.

On the night in question, Raymond Harris was also at Anthony's Bar.  *See* Dkt. No. 13-15 at 280-85.  Moore asked Harris for a ride, and at approximately 2:00 a.m., Harris left the bar to see if Moore was waiting for him outside.  *See id*. at 282.  Harris heard a gunshot, and saw Moore fall to the ground.  *See id*. at 285-86, 299-300, 336-39, 341-43, 350-51.  According to Harris, Petitioner was standing several feet away from Moore and was pointing a gun at him. *See id*. at 286, 294, 309-310, 345, 402.  Harris turned to go back inside the bar, heard a second gunshot, and

felt a sensation in his arm. *See id*. at 286-87. Once he was inside the bar, Harris heard three or four more gunshots. *See id*. at 287. Harris testified that he thought Petitioner was wearing a blue baseball cap, but was not certain of the color. *See id*. at 289, 291, 298. Harris identified Petitioner's picture in a photo array prepared by police one day after the shooting. *See id*. at 308, 310-12.

Harris suffered a gunshot wound that passed through the soft tissue of the left side of his chest and through his left arm. *See* Dkt. No. 13-15 at 288, 291-93, 359-62, 502-507. He spent three or four days in the hospital, suffered nerve damage, and, at the time of trial, he continued to have no sensation in two fingers on his left hand. *See id*. at 292-93, 554-58. Police recovered five small, clear baggies containing a white powdery substance from the zippered part of the sleeve of Harris's coat. *See id*. at 372-73. Harris denied knowledge of the baggies, and denied being at the bar to sell drugs. *See id*. at 297, 300.

Moore died from injuries sustained as a result of the shooting. *See* Dkt. No. 13-15 at 233-35, 580-93, 596-99. Five projectiles and one bullet fragment were recovered from his body. *See id*. at 588-89. No weapon was found on or near Moore's body, and no shell casings were recovered. *See id*. at 241-42, 267, 349, 353, 389.

At around 3:00 a.m. on November 28, 2002, Jennifer Halwig received a telephone call from Petitioner's aunt, Nancy Reyes. *See* Dkt. No. 13-15 at 424. Reyes heard about the shooting and was worried because she did not know if Petitioner was out that evening. *See id*. Halwig called Petitioner, and when they eventually spoke at around 4:00 a.m., Petitioner told Halwig he was with friends and that he would call her later in the morning. *See id*. at 425-28.

At approximately 3:00 a.m., Petitioner visited Wykenda Barnes at her apartment located on the first floor of the Brandagee Apartments in Utica. *See id*. at 534-36. Barnes retrieved her

coat, and when she returned to the door to meet Petitioner, he was speaking with Peter Nieves, who lived in an apartment on the third floor of the complex. *See id.* at 499-500, 538-39. Petitioner and Barnes left the apartment building and got into a car driven by Petitioner's aunt, Nancy Reyes. *See id.* at 538-39. Petitioner told his aunt to get him home and "off the street." *See id.* at 541-42. Petitioner was rubbing his head and seemed nervous, like something was bothering him. *See id.* at 541-42. Petitioner left the apartment at approximately 9:30 a.m. with Victor Arimont, Reyes's fiancé. *See id.* at 547.

According to Peter Nieves, he was asleep in his apartment on the third floor of the Brandagee Apartments when he was awakened by the security buzzer for his apartment. *See id.* at 449-52. When he arrived in the lobby, he saw Petitioner and Wykenda Barnes, another resident of the apartment complex. *See id.* at 452. Nieves shook hands with Petitioner, spoke to him briefly, and returned to his apartment. *See id.*

At trial, Nieves testified that he did not remember the specific conversation he had with Petitioner. *See id.* at 454-55. Nieves testified that he was taking controlled substances for health issues and depression and could not "remember exactly what [he] said." *See id.* at 453. Nieves remembered testifying at the grand jury, but when he was asked if his grand jury testimony refreshed his recollection regarding the conversation he had with Petitioner, Nieves stated that he did not "remember having this conversation exactly in [his] head." *See id.* at 455. He denied being threatened not to testify by Petitioner or his associates, but admitted that he called the prosecutor and told him about an incident where he was walking toward a store and an unknown person in a car tried to cut his arm and tried to pull him into the car. *See id.* at 455-56. The prosecutor was granted permission, over trial counsel's objection, to treat Nieves as a hostile witness. *See id.* at 457.

Nieves denied knowledge of the content of his statement to police or his grand jury testimony. *See id.* at 458-80. He testified that he was taking drugs and did not remember telling police that Petitioner told Nieves he was in trouble, that someone tried to take his chain, that Petitioner shot someone, or that Petitioner made a gesture with his hand across his neck. *See id.* at 458, 461-62, 479-80. Nieves testified that the police found him at work and asked him to come to the police station to answer questions about Petitioner. *See id.* at 472-73. Nieves testified that he went home, met his wife and daughter, and the three of them walked to the police station. *See id.* at 473-74.

When he arrived at the police station, Nieves testified that the police told him they had a tape of his meeting with Petitioner in the lobby of the apartment building, and that Petitioner made a gesture with his hand. *See* Dkt. No. 13-15 at 462-64, 476. Nieves denied telling police that the gesture meant that the victim was dead. *See id.* at 463. Nieves claimed that he signed his statement to police without reading it because he wanted to leave the police station, and he did not remember placing his initials at various places in the statement. *See id.* at 459-61. Nieves further testified that he did not recall telling the grand jury that Petitioner told him that he shot someone. *See id.* at 476-78. Nieves testified that on the morning he was scheduled to testify at trial, his brother-in-law told him, "[i]f you can't remember, you can't remember." *See id.* at 465-66. Nieves also testified that he told a different prosecutor before trial that he could not remember his conversation with Petitioner, and that the prosecutor told him that he could not force Nieves to remember. *See id.* at 465.

On cross-examination, Nieves testified that the prosecutor threatened him with perjury charges, and that the prosecutor told him he was not telling the truth when he said he could not remember. *See id.* at 483. Under further questioning by the prosecutor, Nieves clarified that the

prosecutor told him to tell the truth, and stated that if he did not, he could face perjury charges. *See id*. at 483-84.

The testimony at trial also established that, on November 28, 2002, at approximately 11:00 a.m., Petitioner called Halwig and informed her that he was not going to Halwig's grandmother's house for Thanksgiving dinner. Instead, he was going to celebrate the holiday with his relatives in New York City. *See id.* at 422-24.

Bystanders interviewed at the scene of the shooting gave police conflicting information. *See id.* at 392. In addition to the information provided by Harris and other witnesses, police were informed by unidentified bystanders that the shooter got out of a vehicle, shot Moore twice, then fired two more shots at Moore once he collapsed, and that the shooter then left in the vehicle. *See id*. at 254-56, 392-98. One unidentified bystander told police that the gunshots were fired from inside a vehicle, *see id.* at 268, and another told police that the shooter left the scene in a silver Nissan. *See id*. at 254. Police also received conflicting descriptions of the suspect's clothing. *See id.* at 522, 526-28. Daniel Doyle, Michael Davis, and Hans Kunz testified that they witnessed the shooting, but could not identify the shooter. Each testified that the shooter approached Moore on foot, shot him at close range, and that after Moore was shot and collapsed, the shooter fired additional shots. *See id*. at 335-40, 344-46, 349-52, 356, 400-05. Kunz also testified that the shooter was wearing a red bandanna. *See id*. at 402, 409. Approximately twenty-five people were shown photo arrays, but only Harris identified Petitioner. *See id*. at 528.

Petitioner became a suspect in the shootings on November 29, 2002, after police spoke with Jennifer Halwig's mother. *See id.* at 515, 518-19. Police discovered that Petitioner did not have a valid New York State pistol permit. *See id*. at 498. On November 30, 2002, police spoke with Nancy Reyes and charged her with hindering prosecution. *See id*. at 515-16. Petitioner was

eventually found in New York City, and on December 22, 2002, members of the Utica Police Department transported Petitioner back to Utica to face charges. *See id.* at 518.

At the close of the People's proof, Petitioner's trial counsel, Robert Moran, moved to dismiss the murder charges on the ground that there was no proof that Petitioner shot Moore. *See id.* at 602-605. The trial court dismissed the depraved indifference murder and assault charges (counts two and four of the indictment), but denied Moran's motion to dismiss the remaining counts. *See id.* at 604-06.

Moran then called Victor Arimont to testify on Petitioner's behalf. Arimont testified that Petitioner and his family made plans to travel to New York City approximately one week prior to the shooting. *See id.* at 607-09. Arimont picked Petitioner up on November 28, 2002 at approximately 9:30 a.m., and took him to Reyes' home to pack for the trip. *See id.* at 610-12. Petitioner, Reyes, and several children left for New York City at approximately 11:30 a.m. *See id.* at 612. Petitioner called no other witnesses and rested. *See id.* at 617.

The jury began its deliberations on June 12, 2003. On June 13, 2003, the jury convicted Petitioner of second degree intentional murder, first degree intentional assault, and second degree criminal possession of a weapon. *See id.* at 726-28.


**C.      Post-trial**

In August 2003, after Petitioner's trial but before Petitioner was sentenced, Moran was arrested and charged with third degree criminal possession of a controlled substance. *See* Dkt. No. 13-1 at 58. Upon Moran's arrest, Petitioner retained Anthony LaFache to represent him. *See id.*

On February 19, 2004, LaFache filed a motion to set aside the verdict in which he argued

that Moran had been using methamphetamine during Petitioner's trial and, as a result, Moran was ineffective for failing to (1) properly prepare for trial; (2) meet with Petitioner; (3) question Harris about his use of drugs at the time of the shooting and any favorable treatment he may have received in exchange for his testimony; and (4) hire an investigator despite being paid to do so. *See id.* at 21-22, 59; Dkt. No. 13-6 at 5-6.[4] LaFache also argued that Moran was under the influence of methamphetamine throughout his representation of Petitioner. *See id.* Finally, LaFache argued that it violated Petitioner's right to a fair trial "not to have advised him of the ongoing investigation of his attorney while the trial was proceeding." *See id.* at 22. In response, the prosecution argued that there was no proof that Moran used drugs during his representation of Petitioner, or that any alleged drug use impaired Moran's ability to represent Petitioner. *See id.* at 59-60.

On March 3, 2004, the trial court denied LaFache's motion, finding that there was no proof Moran was under the influence of drugs during the trial, and that Moran diligently represented Petitioner. *See id.* at 23, 60; Dkt. No. 13-6 at 6-7.

On March 17, 2004, Petitioner was sentenced to serve a term of twenty-five years to life for his second degree murder conviction, a consecutive determinate term of twenty-five years in prison followed by five-years post-release supervision for his first degree assault conviction, and a consecutive determinate term of fifteen years in prison followed by three years post-release supervision for his criminal possession of a weapon conviction. *See* Dkt. No. 13-15 at 739-40.

On March 18, 2004, Petitioner filed a notice of appeal. *See* Dkt. No. 13-1 at 60. On May

---

[4] No copy of LaFache's motion was provided to the Court. The information regarding the motion, the prosecutor's response and the trial court's decision on the motion was taken from Petitioner's brief on direct appeal and from Petitioner's counseled section 440 motion. *See* Dkt. No. 13-1 at 59-60; Dkt. No. 13-6 at 4-9.

31, 2006, before his direct appeal was perfected, Petitioner's appellate counsel filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law ("CPL") §440.10. *See id.* at 60-61; Dkt. No. 13-6 at 2-9. In the motion, appellate counsel explained that on April 27, 2004, Moran pleaded guilty to third degree criminal possession of a controlled substance in Oneida County Court and was sentenced on December 1, 2004, to serve eight and one-half to twenty-five years in prison. *See* Dkt. No. 13-6 at 7-8. During his plea colloquy, Moran admitted that he purchased methamphetamine in Phoenix, Arizona, transported it back to Oneida County, and that when he was arrested, he was in possession of five and one-half ounces of methamphetamine in his jacket pocket. *See id.* at 7. At sentencing, Moran admitted that he became addicted to methamphetamine. *See id.* at 8. Further, Moran stated that he thought he had control over the drug and that it allowed him to work longer and faster and to remain focused, but that over time the drug controlled him and he could not stop using it. *See id.* at 8. He also stated that he became drug-free after he was arrested and was admitted to a drug treatment center. *See id.* Petitioner's appellate counsel argued that, based on Moran's statements, his drug use was no longer speculative and that it had adversely impacted Moran's representation of Petitioner. *See id.* at 8-9.

The trial court denied Petitioner's counseled section 440 motion on August 31, 2006, without a hearing, concluding that "based upon the entire record of these proceedings, and the lack of any facts in [Petitioner's] motion which would warrant a hearing upon the motion, . . . [Petitioner] was provided with more than meaningful representation in this matter." *See* Dkt. No. 13-8 at 2-6 (citation omitted). On February 2, 2007, the Appellate Division, Fourth Department denied Petitioner leave to appeal. *See* Dkt. No. 13-10 at 2.

On or about July 14, 2006, Petitioner filed a *pro se* supplemental section 440 motion, in which he argued that Moran had a conflict of interest that adversely affected his representation of

Petitioner.  *See* Dkt. No. 1-2 at 17-22; Dkt. No. 21 at 36.[5]  In his *pro se* motion, Petitioner claimed

that on June 16, 2003, after his trial, the Oneida County District Attorney's Office applied for a

wiretap and pen register on Moran's home, office and cell phone lines, before the same judge who

presided over Petitioner's trial – Judge Donalty.  *See* Dkt. No. 21 at 34.  Petitioner further claimed

that on June 24, 2003, and July 15, 2003, Judge Donalty issued amended warrants, and on August

17, 2003, Judge Donalty issued a search warrant for Moran's office and home.  *See id.* at 35.

Petitioner argued that the indictment against Moran accused him of distributing

methamphetamine between January 2002 and August 17, 2003.  *See id.*  As such, in light of these

facts, Petitioner argued that Moran had a conflict of interest and that he was prejudiced by this

conflict, which resulted in ineffective assistance.  *See id.* at 36.  Specifically, Petitioner claimed

that Moran could have pursued an alternate course of representation by conducting an

investigation but that he failed to do so.  *See id.* at 41.

Petitioner and Respondent both agree that Petitioner's *pro se* motion was dismissed

because the court concluded that it appeared to raise the same claims that were presented in the

counseled section 440 motion.  *See* Dkt. No. 1-2 at 20; Dkt. No. 12 at 9 n.9.[6]  Petitioner states that

---

[5] Petitioner included a copy of his *pro se* section 440 motion as an exhibit to his Traverse. *See* Dkt. No. 21 at 26-51.  Respondent acknowledges that Petitioner filed the *pro se* motion, *see* Dkt. No. 12 at 9 n.9, but did not include a copy of the motion in his state court records.

Petitioner apparently attached several exhibits to his *pro se* motion.  *See id.* at 45-51.  One of the exhibits was a letter from Moran to the Attorney Grievance Committee, dated June 3, 2004. *See* Dkt. No. 21 at 47-48 (the "Moran letter").  In the letter, Moran denied Petitioner's claim that he told Judge Barry Donalty that he was "under the influence during the trial[.]"  *See id.* at 48. Moran further stated that he "never appeared in court under the influence of any controlled substance – ever."  *See id.*  Moran further wrote that Petitioner's family was "unable or unwilling to pay for the services of an investigator" and that he was not paid money to hire an investigator. *See id.* at 47.

[6] Petitioner states that he received a letter dated December 7, 2006, from the county court, informing him that

(continued...)

-12-

-n December of 2006, he sought reargument on the ground that his *pro se* motion raised an additional conflict issue that was not raised in his counseled section 440 motion. *See* Dkt. No. 1-2 at 20. In a letter issued by the court, the request for reargument was denied because the "issue was reviewed and a decision regarding same was issued on August 31, 2006." *See id.* at 21. Petitioner states that he sought leave to appeal the denial of his *pro se* section 440 motion, but that leave to appeal was denied in November 2007. *See id.* at 21-22.

On direct appeal, appellate counsel raised the following arguments: (1) the prosecutor was improperly allowed to read Nieves' police statement and grand jury testimony into the record at trial, in which Nieves stated that Petitioner admitted committing the alleged crimes; (2) Petitioner's motion to set aside the verdict based upon Moran's criminal charges, methamphetamine use, and ineffective assistance of counsel should have been granted; (3) Petitioner's sentence for criminal possession of a weapon should run concurrently with his other convictions; and (4) Petitioner's sentence was unduly harsh and severe. *See* Dkt. No. 13-1 at 3-4, 8, 25-52.

On September 28, 2007, the Appellate Division affirmed. It found that Petitioner failed to preserve his argument that the prosecutor improperly impeached Nieves, and declined to reach the issue "in the interest of justice." *People v. Martinez*, 43 A.D.3d 1408, 1408-09 (4th Dept. 2007).

---

> [s]hortly after [appellate counsel's] filing on June 1, 2006, we received a pro-se motion pursuant to CPL 440 that you submitted on your own behalf. After reviewing the pro-se motion and speaking with your attorney, it became apparent that your motion papers raised the exact same issues as were raised in the first motion. Therefore, your second motion is denied as the issues were addressed in this Court's decision dated August 31, 2006.

*See* Dkt. No. 1-2 at 20. No copy of the court's letter is in the record before this Court.

The court also found that the trial court properly denied Petitioner's motion to set aside the verdict

because

> [t]he record does not support [Petitioner's] contention that defense
> counsel was using drugs during the trial, and the remaining
> contentions of [Petitioner] concerning ineffective assistance of
> counsel are based on his disagreements with defense counsel's trial
> strategies. [Petitioner] has failed to meet his burden of establishing
> the absence of any legitimate explanation for those strategies. *See*
> *People v Benevento*, 91 NY2d 708, 712-713 [1998]; *People v*
> *Dennis*, 206 AD2d 843 [1994], *lv denied* 84 NY2d 867 [1994]; *see*
> *also People v Flores*, 84 NY2d 184, 187 [1994]). Based on "the
> evidence, the law, and the circumstances of [this] case, viewed in
> totality and as of the time of the representation," we conclude that
> defendant received meaningful representation (*People v Baldi*, 54
> NY2d 137, 147 [1981]).

*Martinez*, 43 A.D.3d at 1409. The Appellate Division modified Petitioner's sentence for criminal

possession of a weapon, finding that it must run "concurrently with the sentences imposed for the

two remaining counts" of the indictment. *See id.* Thereafter, the court rejected Petitioner's

argument that the sentence, as modified, was unduly harsh or severe. *See id.* Finally, the court

stated that it had "reviewed [Petitioner's] remaining contentions and conclude[d] that they are

without merit." *See id.* On January 24, 2008, Petitioner was denied leave to appeal. *See* Dkt. No.

13-5 at 2; *People v. Martinez*, 9 N.Y.3d 1035 (2008).

On January 26, 2009, Petitioner filed a writ of error coram nobis in the Appellate

Division, Fourth Department, in which he argued that appellate counsel was ineffective for the

following reasons: (1) failing to argue, in the section 440 motion or on appeal, that Moran had a

conflict of interest; (2) raising an unpreserved claim on direct appeal regarding the prosecutor's

alleged improper impeachment of Nieves instead of preserving the claim by including it in the

motion to vacate; (3) failing to argue that the prosecutor committed misconduct when he became

an unsworn witness during his direct examination of Nieves, and by making improper comments

during summation; (4) failing to argue that the trial court erred when it denied Moran's motion to dismiss the indictment; and (5) failing to argue that the trial court improperly denied Moran's request for a jury charge on circumstantial evidence. *See* Dkt. No. 13-11 at 2-29. On March 20, 2009, the Appellate Division denied Petitioner's coram nobis petition. *See* Dkt. No. 13-12 at 2. Leave to appeal was denied by the New York Court of Appeals on June 19, 2009. *See* Dkt. No. 13-14 at 2; *see People v. Martinez*, 60 A.D.3d 1439 (4th Dept. 2009), *lv. denied* 12 N.Y.3d 917 (2009).

**D.    Petitioner's habeas corpus petition and remand by the Second Circuit**

On August 6, 2009, Petitioner filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Dkt. No. 1. The petition claimed, among other things, that Petitioner was denied effective assistance of counsel due to Moran's drug addiction and the conflict of interest resulting from the investigation and prosecution of Moran.

On May 10, 2011, the Court dismissed the petition, rejecting the ineffective assistance claim and finding no *per se*, actual, or potential conflict of interest between Petitioner and Moran. *See* Dkt. No. 35 at 33-36. Petitioner appealed and on August 18, 2011, the Second Circuit granted a certificate of appealability "solely on the issue of whether [Petitioner] was denied effective assistance of counsel due to a conflict of interest presented by the investigation and prosecution of Moran by the same district attorney's office that prosecuted [Petitioner]." *See* Dkt. No. 40 at 3. In a summary order and mandate issued on July 19, 2012, the Second Circuit found that this Court erred in finding that Petitioner's conflict of interest claim was adjudicated on the merits in state court and, therefore, that no evidentiary hearing was required for the Court to dispose of that claim. *See id.* at 5. As such, the Second Circuit remanded the case "solely for the

purpose of an evidentiary hearing to determine whether an actual or potential conflict of interest existed and, if so, whether the conflict adversely affected Moran's representation." *See id.*

E.      **Evidentiary hearing[7]**

On January 3, 2013, the Court held an evidentiary hearing and permitted the parties to file both pre- and post-hearing memoranda.

*1. Testimony of Scott McNamara*

At the hearing, Petitioner first called Scott McNamara, who was the Assistant District Attorney in the Oneida County District Attorney's Office who was in charge of the investigation and prosecution of Moran. *See* Dkt. No. 58 at 15. According to McNamara, he was approached by Keith Grogan, an investigator from the Sheriff's Department, in April or May of 2003, and was advised that he had information indicating that Moran was smuggling methamphetamine from Phoenix, Arizona to his home or his office in New York for the Hell's Angels. *See id.* at 16. Grogan asked if the District Attorney's Office "would agree to do a wiretap on the case, if that's where it ultimately went to." *See id.* When McNamara approached the District Attorney, Michael Arcuri, with the request, Arcuri said that he was not interested in prosecuting the case. *See id.* at 17. At some point in the middle of May, after another meeting took place between the local police and Arcuri, during which Arcuri finally gave his permission to allow the investigation to proceed and indicated that he would apply for a wiretap when there was sufficient evidence to support the application. *See id.*

_____

[7] The Court appointed Frederick Rench, Esq. to represent Petitioner at the evidentiary hearing and for all related matters.

-16-

Upon receiving permission to proceed, Grogan continued his investigation and Arcuri instructed McNamara as follows: "Arcuri advised me that I was not to discuss this investigation with anybody, including anybody that I worked with, that the only people in the District Attorney's Office that were to know about this matter were myself and the District Attorney himself." *See id.* at 18. As the investigation progressed, McNamara informed Arcuri that the case was creating more work than he could handle by himself. *See id.* Therefore, Arcuri permitted McNamara to enlist the help of another assistant district attorney, Joe Saba. *See id.* McNamara testified that they continued to maintain secrecy within the office and that it was not until approximately August 1, 2003, when he requested the assistance of another assistant district attorney, that any other member of the District Attorney's learned about the Moran investigation. *See id.* at 19.

When McNamara was asked if he ever informed Paul Hernon – the assistant district attorney in charge of prosecuting Petitioner – about the Moran investigation, he responded as follows:

> A. No. Paul Hernon and I never discussed Mr. Moran's case. Matter of fact, the first time Paul Hernon and I ever talked about the fact that we were investigating Mr. Moran was on August 18th of 2003, the day after Mr. Moran was arrested and this whole thing had kinda hit the media and the public.
>
> Q. What did you and Mr. Hernon discuss then?
>
> A. It was at our morning meeting. Every meeting – every morning, the District Attorney's Office, we have a meeting, it starts at quarter of nine. I walked into that meeting. To the best of my recollection, Mr. Hernon was already there. He looked at me, he says what the heck happened, what's goin' on with Moran, and I said, you know, we had a long investigation on him, you know, and I just basically told him that it had started actually when this case that we're here for, you know, before this case, so, and he was like I didn't even know and I said I know that.

*See id.* at 19-20.

At the hearing, McNamara then discussed the eavesdropping warrant that he applied for in the Moran case. *See id.* at 22-23. According to McNamara, on June 12, 2003, he and the law enforcement officers investigating Moran went to see Judge Donalty. *See id.* at 24. Specifically, McNamara testified that, to the best of his recollection, they went to see Judge Donalty "later in the afternoon, [when] he was done with his court, which there was a trial goin' on with Mr. Martinez." *See id.* When they informed Judge Donalty why they were there, "he just said no, I'm not lookin' at this until the trial's over." *See id.* When asked if Judge Donalty was aware of the fact that they were seeking a wiretap for Moran's phone, McNamara stated

> I would assume that he knew that. I don't remember specifically what we told him, but I would definitely assume that Moran's name came up in the middle of it 'cause that's why he told us to leave, that he didn't want to deal with this – I can't speak for Judge Donalty, but my impression was he did not want us having Moran's phone tapped while Moran was tryin' a murder case and all of us bein' open to the question of whether or not we were listening to privileged communications between ourselves and your client now, which was Moran's client then.

*See id.* at 25-26. Further, McNamara testified that he does not believe that he informed Judge Donalty the reason for scheduling an appointment with him until he arrived at his office. *See id.* at 26.

McNamara testified that Petitioner's trial before Judge Donalty ended the following day, Friday, June 13, 2003, and, therefore, they did not meet with Judge Donalty again until the following Monday. *See id.* at 26-27. Moreover, McNamara testified that they did not have probable cause at that time to believe that Moran was involved in the distribution of methamphetamine, but they had such probable cause to believe that Moran's live-in girlfriend was selling methamphetamine out of Moran's house. *See id.* at 28-29. Although not rising to the level of probable cause, McNamara stated that they had "information from other sources" that Moran

was acting as the "mule." *See id.* at 29. Further, McNamara stated that he did not have reason to believe, at that time, that Moran was personally using methamphetamine. *See id.*

During his cross-examination, McNamara again stated that he was under strict orders to keep the Moran investigation confidential and that he did so to the best of his ability. *See id.* at 30-31. McNamara stated that the need for secrecy was due to the Hell's Angels involvement and the fact that they are "notorious for counter surveilling people investigating them." *See id.* at 31. Further, he reiterated that, within his office, aside from himself, the only people that knew about the Moran investigation were Arcuri, Mr. Saba, and Carla DeMarco – the two assistant district attorneys who eventually became involved with the investigation. *See id.* at 31-32.

Further, McNamara testified that, based on the wiretaps and other surveillance, he came to believe that Moran had no idea that he was under investigation. *See id.* at 32-33. During the investigation, Moran continued obtaining drugs from Arizona and distributing them in Oneida County. *See id.* at 33. Further, he continued to have telephone conversations with members of the Hell's Angels, "[b]oth cryptically and surprisingly not so cryptic sometimes." *See id.* Finally, responding to questions posed by the Court, McNamara reiterated that he did not speak with Paul Hernon about Petitioner's case or the Moran investigation until August 18, 2003, when the media reported on Moran's arrest. *See id.* at 34.

### 2. Petitioner's testimony

Petitioner was the second witness called during the hearing. *See* Dkt. No. 58 at 36. Petitioner testified that he first learned that Moran had been investigated and arrested in August of 2003, after hearing about it in the news. *See id.* Further, he testified that, following Moran's arrest, neither Judge Donalty nor any other judge conducted a hearing to determine if Moran had

-19-

a conflict with him as a result of Moran's criminal investigation and arrest.  *See id.* at 37, 39.

### 3. Keith Grogan's testimony

After Petitioner, Respondent called it's only witness, Keith Grogan, who was a member of the Oneida County Sheriff's Department in 2003.  *See id.* at 40-41.  Grogan testified that he became involved in the Moran investigation in April or May of 2003.  *See id.* at 41.  Further, Grogan testified that, during a proffer session with Moran in the latter portion of 2004, Grogan asked Moran if he was aware at any time that he was under investigation, to which Moran responded that he was not.  *See id.* at 43-44.

## III. DISCUSSION

### A.    Standard of review

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254.  In discussing this deferential standard, the Second Circuit noted that

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United States"; or
> (2) was "based on an unreasonable determination of the facts in
> light of the evidence presented in the State court proceeding."

*Rodriguez v. Miller*, 439 F.3d 68, 73 (2d Cir. 2006), *cert. granted, judgment vacated and cases remanded on other grounds by* 549 U.S. 1163 (2007) (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) (quotation omitted);

*Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has observed that

> a state court's decision is "contrary to" clearly established federal law if it contradicts Supreme Court precedent on the application of a legal rule, or addresses a set of facts "materially indistinguishable" from a Supreme Court decision but nevertheless comes to a different conclusion than the Court did. [*Williams v. Taylor*, 529 U.S. 362] at 405-06, 120 S. Ct. 1495 [(2000)]; *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001). . . . [A] state court's decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of the case before it. *Williams*, 529 U.S. at 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted). Courts have interpreted "objectively unreasonable" in this context to mean that "'some increment of incorrectness beyond error'" is required for the habeas court to grant the application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

A state court determines a petitioner's federal claim "on the merits" and triggers the highly-deferential AEDPA standard of review when the state court "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan*, 261 F.3d at 312 (quotation omitted). In this regard, it is not necessary for the state court to refer explicitly to the particular federal claim or to relevant federal case law. *See id.*

-21-

Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed feelings of fact and conclusions of law are reviewed de novo.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *see also Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)). In light of the Second Circuit's determination that Petitioner's conflict of interest claim was not adjudicated on the merits by the state courts, the Court must apply the pre-AEDPA standard of *de novo* review.

**B.      Conflict of interest**

"Where a constitutional right to counsel exists, [the U.S. Supreme Court's] Sixth Amendment cases hold there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). Conflicts of interest fall into three categories: (1) *per se* conflicts; (2) actual conflict; and (3) potential conflicts. *See United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) (citation omitted). *Per se* conflicts of interest are "so severe" that they cannot be waived, and "do not require a showing that the defendant was prejudiced by his representation." *Id.* Actual conflicts of interest occur when the interests of the defendant and his counsel "diverge with respect to a material factual or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002) (internal quotation marks omitted). Finally, potential conflicts of interest arise if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998) (citation omitted). To violate the Sixth Amendment, an actual conflict must adversely affect the attorney's performance, while a potential conflict must result in prejudice to the defendant. *See United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994) (citation

omitted).

In the present matter, the Second Circuit remanded this action to this Court "solely for the purpose of an evidentiary hearing to determine whether an actual or potential conflict of interest existed, and, if so, whether the conflict adversely affected Moran's representation." *See* Dkt. No. 40 at 5.

### 1. Actual conflict of interest

Although a defendant alleging a Sixth Amendment violation must usually demonstrate prejudice resulting from the violation under *Strickland v. Washington*, 466 U.S. 668 (1984), when a defendant demonstrates an "actual conflict of interest," prejudice is presumed. *See Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980). "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. at 172 n.5; *Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) (stating that an actual conflict and adverse effect should be considered in a "single, integrated inquiry"). "To demonstrate adverse effect, a defendant must establish that an 'actual lapse in representation,' resulted from the conflict." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993) (quoting *Cuyler*, 446 U.S. at 336).

Conflicts of interest exist "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. John Doe No. 1*, 272 F.3d 116, 126 (2d Cir. 2001) (internal quotation marks omitted). Such divergences in interest have been found where, for example, counsel was personally implicated in wrongdoing related to the case, *United States v. Levy*, 25 F.3d 146 (2d Cir. 1994), or counsel was accused of coercing his client's guilty plea, *Lopez v. Scully*, 58 F.3d 38 (2d Cir. 1995). In such situations, counsel's and the client's interests diverged because the

attorney, "fearing answers that might incriminate himself, . . . would have a strong personal desire to refrain from inquiring at the defendant's trial into certain matters that were directly relevant to, and potentially exculpatory of, his client." *Levy*, 25 F.3d at 157; *see also Lopez*, 58 F.3d at 41 (noting the tension requiring the attorney either to admit to serious ethical violations possibly amounting to malpractice or to contradict his client in a manner that would undermine the client's effort to overturn his conviction). No such divergent interests are apparent here.

"There is no Supreme Court precedent establishing that a pending prosecution in the same jurisdiction is an actual conflict." *Corniel v. N.Y.S. Division of Parole*, No. 04 cv 2577, 2007 WL 1649895, *6 (S.D.N.Y. June 6, 2007). Moreover, the Second Circuit has held that prosecution or investigation by the same office, standing alone, is not grounds for finding an actual conflict. *See Armienti v. United States*, 313 F.3d 807, 814 (2d Cir. 2002); *see also Levy*, 25 F.3d at 156-57; *Skinner v. Duncan*, No. 01 Civ. 6656, 2003 WL 21386032, *43 (S.D.N.Y. June 17, 2003) (citations omitted). Therefore, while prosecution by the same jurisdiction could give rise to "a plausible claim [of] . . . an actual conflict of interest," it is not automatic. *Armienti*, 313 F.3d at 814, 824-25.

In *Armienti*, the petitioner tried to establish that there was an actual conflict of interest between himself and his trial attorney (Shargel) because his attorney was the target of an investigation by the same prosecuting authority. *See Armienti*, 313 F.3d at 814. The testimony established that, although Shargel knew that he was at one point the target of an investigation, he was unaware that he was still being investigated. *See id.* The Second Circuit rejected the petitioner's attempt to liken his situation to that present in *United States v. Levy*, 25 F.3d 146 (2d Cir. 1994), where the court found an actual conflict of interest because of the attorney's investigation by the same prosecuting authority. *See id.* Specifically, the Second Circuit held

that, aside from the fact that Shargel was unaware that he was still the target of an investigation, "numerous other considerations informed our decision in *Levy*: the attorney in *Levy* represented both co-defendants in the case; the attorney possessed privileged information from his relationship with Levy's co-defendant that was directly relevant to Levy's defense; there existed a possibility that the attorney would be called as a trial witness; and the attorney may have participated in the flight of Levy's co-defendant." *Id.* (citing *Levy*, 25 F.3d at 156-57).

In the present matter, Petitioner has failed to establish that an actual conflict of interest existed between himself and Moran. The testimony at the hearing made clear that Moran was unaware that he was under investigation by the Oneida County District Attorney's Office or Sheriff's Department. McNamara testified that the eavesdropping warrant was not applied for until June 12, 2003, the second to last day of Petitioner's trial and, after the jury had already begun its deliberations. *See* Dkt. No. 58 at 23-26. Moreover, McNamara testified that he did not have reason to believe that Moran was using methamphetamine at that time and that he did not have probable cause to believe that Moran was directly involved in the distribution of the substance; he did, however, have such cause to believe that Moran's live-in girlfriend was distributing. *See id.* at 26-29.

Further, McNamara testified that he was under strict orders to keep the Moran investigation a secret, even within his own office. *See id.* at 30-31. It was not until Moran was arrested that the remainder of McNamara's office, including Hernon, found out about the ongoing investigation. *See id.* at 31-32, 34. McNamara stated that, based on the wiretaps and other surveillance, he came to believe that Moran had no idea that he was under investigation. *See id.* at 32-33. This belief was based on the continued trips that Moran made to Arizona to purchase methamphetamine, the continued distribution of the substance, and the cryptic and not so cryptic

telephone conversations he was having with members of the Hell's Angels gang. *See id.* Finally, Grogan testified that, during a proffer session with Moran in the latter portion of 2004, he asked Moran if he was aware he was under investigation, to which Moran responded that he was not. *See id.* at 43-44.

Based on the testimony presented at the evidentiary hearing, it is clear that both Moran and Hernon were unaware that Moran was under investigation until after Petitioner was convicted. Without knowledge that he was under investigation, Moran clearly could not have been influenced by such an investigation. Unlike the situation in *Levy*, Petitioner has failed to establish that the investigation of Moran created an actual conflict of interest. *See Armienti*, 313 F.3d at 814-15. Further, the investigation into Moran's conduct involved a completely different substantive crime than Petitioner's, and it was "factually and temporally distinct from" Petitioner's crimes. *See Levy*, 25 F.3d at 157 n.8; *United States v. Fulton*, 5 F.3d 605, 609-12 (2d Cir. 1993) (finding an actual conflict where the defendant alleged that counsel was engaged in the heroin trafficking with which the defendant was charged). Given these circumstances, there is no reason to conclude that Moran was operating under a fear of some kind of action by the Oneida County District Attorney's Office or Sheriff's Office, or that he wanted to gain favor with either of those offices or the trial court. Further, the assistant district attorney in charge of Petitioner's case, Paul Hernon, was unaware of the Moran investigation until after Petitioner's trial. Accordingly, Petitioner has failed to demonstrate the existence of an actual conflict in which his and Moran's interests diverged.

Finally, even if the Court were to assume that Petitioner established an actual conflict of interest, Petitioner has failed to establish that this conflict adversely affected Moran's

representation.[8] Nothing in the record suggests that there was a lapse in representation based on Moran's own criminal investigation. Petitioner's case is unlike the situation in *United States v. Levy*, where the Second Circuit found an actual conflict where counsel "may have believed that he had an interest in tempering his defense of [his client] in order to curry favor with the prosecution" or that "a spirited defense" of his client would have prompted the government to pursue the case against counsel with "greater vigor." *Levy*, 25 F.3d at 156. Quite simply, Petitioner failed to establish that "'actual lapse in representation,' *Cuyler*, 446 U.S. at 336, 100 S. Ct. at 1711, resulted from the conflict." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 2003).

On appeal, Petitioner argued that Moran's criminal activities left him too busy to focus on Petitioner's case. For example, he argued that Moran should have hired an investigator and interviewed the approximately sixty-two people who gave statements to the police. *See* Petitioner's Brief on Appeal at 26-27. Petitioner's frustration with Moran's handling of the pretrial investigation of his case does not amount to a lapse in representation due to a conflict of interest. It is well established that a petitioner "cannot establish an actual conflict of interest merely by expressing dissatisfaction with [the] attorney's performance." *United States v. John Doe #1*, 272 F.3d 116 (2d Cir. 2001). Further, Moran's decision to not interview additional witnesses to the shooting is insufficient to establish that a conflict adversely impacted his representation. Nothing in the record indicates whether, after reviewing the witness statements to the police, Moran decided to forego interviewing the witnesses altogether, or whether he actually contacted some of the witnesses and concluded that their trial testimony would not have been helpful to the defense. So long as Moran was not deterred from interviewing these witnesses out of a fear of retribution

---

[8] The Court notes that Petitioner failed to address this inquiry during the evidentiary hearing or in his post-hearing memorandum. Petitioner did, however, raise this argument in his appellate brief and in his memorandum in support of his petition.

from law enforcement – and there is absolutely nothing in the record to suggest that occurred in this case – his strategic decisions should not be disturbed. *See Eze v. Senkowski*, 321 F.3d 110, 128 (2d Cir. 2003) (holding that "a defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb"). Finally, as the record before the Court makes clear, Petitioner has not demonstrated "some plausible alternative defense strategy or tactic might have been pursued" which "possessed sufficient substance to be a viable alternative," but that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler*, 7 F.3d at 309 (quotations omitted).

Based on the foregoing, the Court finds that Petitioner has failed to establish an actual conflict of interest that adversely affected Moran's performance.

### 2. Potential conflict of interest

Claims of counsel's conflict of interest that do not qualify as either *per se* or actual are generally treated as potential conflicts of interest. *See Armienti*, 234 F.3d at 824. "In order to prevail on such a claim, the petitioner must establish both that counsel's conduct fell below an objective standard of reasonableness and that but for this deficient conduct, the result of the trial would have been different, under the familiar standard established by *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *Id.*

The record before the Court clearly establishes that Moran provided Petitioner with effective representation throughout the case. As discussed, early in the case, Moran was successful in his request for a suppression hearing to determine the admissibility of Petitioner's statements to the police. Later, Moran established that Petitioner's statements were taken in

violation of his constitutional rights and convinced the prosecution to withdraw their request to introduce those statements on their direct case.

In his opening statement, Moran presented the jury with a cohesive and effective theory of the defense, describing the prosecution's main witnesses, Gregory Moore and Raymond Harris, as drug dealers and "thugs" who were not worthy of belief. *See* Dkt. No. 13-15 at 222-25. Further, Moran presented the jury with a plausible theory of the case that differed from the prosecution's version of events. Moran asserted that the evidence would show that Petitioner offered assistance to a female patron of the bar who was being harassed by Moore. *See id.* at 222-23. Moran stated that when Petitioner attempted to intercede, Moore cursed at Petitioner, pulled on the chain that Petitioner wore around his neck, and displayed a gun in his waistband. *See id.* at 223-24. Moran also emphasized that, although approximately one-hundred people were in the bar at the time, only Raymond Harris could identify Petitioner and that the other witnesses who testified provided varying accounts of the shooting. *See id.* at 223, 225-26. Moreover, Moran told the jury that the evidence would establish that Petitioner had made plans before the shooting to go to New York City for Thanksgiving, and that the prosecution's suggestion that Petitioner fled to New York was not true. *See id.* at 224.

Moran continued to provide effective representation throughout the trial. Moran cross-examined the prosecution's witnesses effectively and made a number of objections, of which many were sustained. *See, e.g.,* Dkt. No. 13-15 at 600-01. True to his word in his opening statement, Moran presented a defense witness – Victor Arimont – who testified that Petitioner made plans to travel to New York City for Thanksgiving before the shooting occurred. *See id.* at 607-17. At the conclusion of the prosecution's case, Moran moved to dismiss the charges against Petitioner, prompting the trial court to dismiss the murder and assault charges that were based on

depraved indifference.  *See id.* at 603-06.

Finally, Moran presented a cogent and thoughtful summation in which he argued that the police had conducted a sloppy investigation.  He emphasized that of the twenty-five people present in the bar at the time of the shooting who viewed the photo array, only one identified Petitioner as the shooter.  He also reminded the jurors that the murder weapon was never recovered, and that there were no fingerprints or other evidence linking Petitioner to the crime.  *See id.* at 640-41.  Moreover, Moran emphasized that the witnesses who testified provided conflicting accounts of where Petitioner was at the relevant times during the shooting and incorrectly testified about the color of Petitioner's clothing on the night in question.  Moran concluded by noting that the wide variation in witness accounts of the shooting supported the weakness in the prosecution's case and that Petitioner's prosecution was predicated entirely on mistaken identity.  *See id.* at 632-33.

An examination of the record as a whole clearly demonstrates beyond question that Moran's overall performance was both aggressive and highly competent.  *See Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) (holding that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy").  Moran presented a cogent and vigorous defense that, although ultimately unsuccessful, was far from ineffective.

Based on the foregoing, the Court finds that Petitioner has failed to establish that Moran's conduct before and during trial fell below an objective standard of reasonableness and that, but for this deficient conduct, the result of the trial would have been different.

### 3. The trial court's inquiry obligation

On remand, Petitioner argues that the trial court had an obligation to inquire into Moran

and Petitioner's alleged conflict once it learned that Moran was under investigation.  Specifically, Petitioner argues that reversal of his conviction is required because the trial court learned that Moran was under investigation when McNamara went to Judge Donalty on June 12, 2003 seeking a wiretap, which was one-day prior to the conclusion of Petitioner's trial.  Respondent, however, argues that this claim was not raised in state court, but for the first time on appeal and at the evidentiary hearing.  *See* Dkt. No. 60 at 9.  Further, Respondent argues that, although Petitioner raised this claim before the Second Circuit, the mandate did not include this issue for the district court to address; and, therefore, the claim is beyond the scope of the mandate and should not be considered by the Court.  *See id.* at 7 (citation omitted).  Even if the claim was preserved for habeas review, Respondent argues that the Supreme Court has made clear that reversal is not required when the trial court fails to inquire into a possible conflict of interest of which it knows or reasonably should have known.  *See id.* at 7-8.[9]

First, to the extent that Petitioner is attempting to argue that there existed a "structural error" because Moran was being investigated by the same district attorney's office that was prosecuting his case and the trial court became aware of the investigation but failed to inform him about it, his argument is without merit.  The cases he relies on for this argument did not even address claims of structural error, but simply discussed, among other things, the trial court's inquiry obligation.  *See Armienti*, 313 F.3d at 810 n.2 (holding that because no actual conflict of interest existed, the petitioner's request for an additional hearing as to the trial court's duty of inquiry into the possibility of a conflict of interest was moot; no claim of structural error raised); *Levy*, 25 F.3d at 152 (holding that the trial court did not sufficiently inquire about defense

---

[9] Although the Second Circuit's mandate did not include this issue for the Court to address on remand, the Court will nevertheless address this issue on the merits since it relates to the issues contained in the mandate.

counsel's actual or potential conflicts of interest; no claim of structural error raised).

Second, even though it appears likely that Judge Donalty became aware of the potential conflict of interest on June 12, 2003, after the jury in Petitioner's trial had begun their deliberations, reversal of Petitioner's conviction is not warranted. "In order to 'ensure that a criminal defendant's right to conflict-free counsel is not abridged,' . . . an initial inquiry is required when 'the trial court knows or reasonably should know that a particular conflict exists[.]'" *United States v. Blount*, 291 F.3d 201, 211 (2d Cir. 2002) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)) (internal citation omitted). "When the court is 'sufficiently apprised of even the possibility of a conflict of interest,' its initial obligation is to 'investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all.'" *Id.* (quotation and other citation omitted). "Until the Supreme Court's decision in *Mickens v. Taylor*, [the Second Circuit] had generally held that a failure by the district court to conduct that initial inquiry warranted an automatic vacatur of the conviction and a new trial." *Id.* (citations omitted).

In *Mickens v. Taylor*, the Supreme Court held that the trial court's failure to inquire into a potential conflict of interest on the part of the defendant's attorney, about which the court knew or reasonably should have known, does not automatically require reversal of the conviction, *see Mickens v. Taylor*, 535 U.S. 162, 171-72 (2002) (majority opinion), for "[t]he trial judge's failure to inquire into a suspected conflict is not the kind of error requiring a presumption of prejudice," *id.* at 173 (Kennedy, J., concurring); *see also Blount*, 291 F.3d at 211-12 (citing Justice Kennedy's concurring opinion). In the absence of any suggestion by counsel that he cannot fulfill his duties to all of his clients, "the trial court's failure to make the *Sullivan*-mandated inquiry does not reduce the [defendant's] burden of proof; it [i]s at least necessary, to void the conviction, for [the

defendant] to establish that the conflict of interest adversely affected his counsel's performance."

*Id.* at 173-74 (majority opinion).

> The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures. . . . As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee unfulfilled when the purported conflict has had no effect on the representation.

*Id.* at 179 (Kennedy, J., concurring).

In the present matter, as the Court discussed above, Petitioner has failed to establish an actual or potential conflict of interest that "hampered" Moran's representation of him. Contrary to Petitioner's arguments, without such a finding, the Court is not required to void his conviction. *See Blount*, 291 F.3d at 212.

Based on the foregoing, the Court denies the petition on this ground.


**C.      Certificate of Appealability**

The Court notes that 28 U.S.C. § 2253(c)(1) provides, in relevant part, that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from – (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]"[10]  28 U.S.C. § 2553(c)(1).  A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

---

[10] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed in such actions "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  Fed. R. App. P. 22(b)(1).

Since Petitioner has failed to make such a showing with regard to any of his claims, the Court declines to issue a Certificate of Appealability in this matter. *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted). Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum-Decision and Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Petitioner's petition for a writ of habeas corpus is **DENIED** and **DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Respondent's favor and close this case.

**IT IS SO ORDERED.**

Dated: May 22, 2013
        Albany, New York

Mae A. D'Agostino
U.S. District Judge